## HILL v. BAKER *et al.*

1. Judicial sale: IRREGULARITY IN APPRAISEMENT. Want of qualification of one of the appraisers of real estate sold under execution, as that he was not a householder as provided by section 3362 of the Revision, will not vitiate the sale. The policy of our law is to uphold judicial sales; and the defect in question will be regarded as a mere irregularity not affecting the power of the sheriff to sell.

Hill v. Baker.

2. —— SALE IN GROSS: INADEQUACY OF PRICE. That land embracing several tracts was sold in a body will not invalidate the sale, when it is shown that it was first offered in parcels and no bids were received for it as thus offered.

3. —— Nor will mere inadequacy of price, nor even gross inadequacy, where the original purchaser was not a party to the proceeding, and the premises have, in good faith, been sold to another.

4. International law: COMMERCIAL INTERCOURSE BETWEEN BELLIGERENTS. In time of war, all commercial or business intercourse between citizens of the belligerent States, without the direct permission of the government, is unlawful.

5. —— RULE APPLIED. It is accordingly *held*, that a purchase of real estate lying in Iowa by, and a conveyance thereof to, a citizen of Ohio from a citizen of Virginia, while the latter State was in rebellion against the United States, was unlawful and void.

6. Judicial sale: JUDGMENT LIEN: ATTACHMENT. Where lands of the defendant are attached, and judgment is afterward rendered against him in the proceeding, the lien of the judgment will take relation back to the lien of the attachment.

*Appeal from General Term, Ninth Judicial District.*

FRIDAY, JULY 28.

ON the 5th day of March, 1868, the plaintiff filed a substituted petition in equity averring that one Anderson M. Newman was seized in fee of the west half of south-east quarter, and south-east quarter of north-west quarter, and north-east quarter of south-west quarter, section 24, township 89, north of range 2 west. That Griffith & Knight obtained a judgment in the Dubuque district court against said Newman, with an order for a special execution for the sale of said lands, and that on the 31st day of March, 1866, the same were sold to one Edward Smith for the sum of $720. That Smith, on the 3d day of April, 1866, sold the said lands for value to one Edward McCeeney, and that McCeeney on the 24th of May, 1866, sold the same to plaintiff.

That in the sheriff's deed are the following mistakes: 1.

It recites a sale of the land as though made in a lump. 2. The grant in it seems to be to one Brady, whose name is mixed up in it with the name of Smith, so as to leave it in doubt which of them the conveyance was intended for. The petition further alleges that the defendant Baker has procured a conveyance from Newman, and had the same recorded; that it was not recorded when plaintiff acquired title; that plaintiff had neither actual nor constructive notice thereof. The petition prays a correction of the sheriff's deed, and a cancellation of the deed to Baker.

The answer of Baker admits the prior ownership by Newman of the lands in controversy, the recovery of the judgment by Griffith & Knight, the issuing of a writ of execution, and that it came to the hands of the sheriff, but denies all the other allegations. The answer avers that on the 8th day of December, 1863, Newman and wife conveyed the lands to Jacob Early by a deed which was duly recorded on the 21st day of May, 1864; and that on the 30th of March, 1866, Early and wife conveyed the lands to the defendant Baker, by a deed duly recorded on the 9th day of April, 1866.

On the 5th day of May, 1869, plaintiff filed an amendment to his petition, alleging that at the date of the execution of the deed from Newman to Early, Newman was a resident and citizen of Virginia, then in rebellion and waging war against the United States; that Early was a resident and citizen of Ohio, and that the deed was in violation of law and void. The defendant, in answer to this amendment, admitted that at the time alleged, Newman was a resident and citizen of Virginia, and Early a resident and citizen of Ohio, but denying that Harrisonburg, Virginia, where the conveyance was executed, was then in rebellion and waging war against the United States. And by further amendment to his answer, the defendant alleged that the appraisers were not duly sworn; that one of the appraisers was not a disinterested house-

Hill v. Baker.

holder of the neighborhood; and that the appraisement and sale were for a grossly inadequate price. Afterward, by way of further amendment, the defendant made his answer a cross-bill, and asked that the sheriff's sale might be vacated.

The cause was referred to D. C. Cram to take proofs and report on the whole issue; and upon his report a decree was entered granting the plaintiff the relief asked, and dismissing the defendant's cross-bill. On appeal to the general term the decree of the district court was reversed. The plaintiff appeals. The further necessary facts are stated in the opinion.

*Griffith & Knight* for the appellant.

*Monroe & Deerey* for the appellee.

DAY, Ch. J. — I. The plaintiff must rely upon the strength of his own title, and not upon the weakness of that of his adversary. The first question, then, which demands our consideration, regards the title acquired through the sheriff's sale. One of the appraisers of the property was not a householder. See Rev., § 3362. It is claimed that this defect vitiates the sale. Authorities are not wanting to sustain this view. In the case of *Eddy* v. *Knap*, 2 Mass. 154, it was *held* that a sale was void, when it appeared from the sheriff's return that he had appointed two of the appraisers, and the return did not show that the debtor had refused to appoint one. The case of *Whitman* v. *Tyler et al*, 8 Mass. 284, is to the same effect. In *Williams* v. *Amory*, 14 id. 29, it was *held*, that a sale was vitiated by a failure of the return to state that the appraisers were discreet and disinterested men and freeholders in the county where the land levied on was situated. And in the case of *Libby* v. *Copp*, 3 N. H. 45,

1. JUDICIAL SALE: irregularity in appraisements.

it was *held*, that the return of an extent of an execution upon land must state that the appraisers are residents of the county where the land is situated, otherwise nothing will pass by the sale. In the case of *Cavender* v. *The Heirs of Smith*, 1 Iowa, 306, it was said that the Massachusetts decisions were made upon a statute different from that in most of the States. The New Hampshire decision is based upon those of Massachusetts.

These decisions recognize a strictness of construction against the title acquired at an execution sale, which is in conflict with the law as declared in most of the States, and not in harmony with the genius of our own decisions, the policy of which is to uphold judicial sales.

Most of the cases upon the subject will be found reviewed in the case of *Cavender* v. *The Heirs of Smith*, *supra*, And although none of them, except those above named, involve the direct question presented in this case, yet they recognize principles, from the analogy of which, the point now under consideration may be determined. It is to be observed that, in this case, there is not a want of appraisement, in fact, nor a failure to sell for two-thirds the appraised value. The defect complained of is the want of qualification in one of the appraisers.

Our statute does not make it incumbent on the sheriff to return any fact in connection with the appraisement, except in case the appraised property cannot be sold for two-thirds the valuation. And in such case it is not required that the qualification of the appraisers, or their mode of selection, should be incorporated into the return. In all cases, therefore, these facts may exist merely *in pais*. And if the validity of a sheriff's sale is made to depend upon the proper qualification and selection of the appraisers, the purchaser holds his title continually at the hazard of having it defeated by parol testimony.

To hold that the title may be so affected would equally work an injury to the debtor and to the creditor. It is to the

interest of both that the property, when exposed to sale, should command the highest possible price. This can be accomplished only by affording the purchaser a reasonable degree of protection in his title. Hence it is no less the dictate of reason than of sound policy that, for mere irregularities, judicial sales should not be held void, and liable to collateral impeachment. These are the reasons which have governed, and the principles which have actuated most courts in their decisions upon this subject. In the case of *Wheaton* v. *Sexton*, 4 Wheat. 503, the court said: "The purchaser depends upon the judgment, the levy, and the deed. All other questions are between the party to the judgment and the marshal. Whether the marshal sells before or after the return, whether he makes a correct return, or any return at all to the writ, is immaterial to the purchaser." The following authorities recognize substantially the same doctrine: *Johnson* v. *Carson*, 3 G. Greene, 499; *Shaffer* v. *Bolander*, 4 id. 203; *Voorhis* v. *Bank of U. S.*, 10 Pet. 473; *Cavender* v. *Heirs of Smith*, 1 Iowa, 307, and cases cited. These authorities support the view that the defect complained of is a mere irregularity, not affecting the power of the sheriff to sell, and hence not rendering the sale void. The same considerations apply to the objections that the appraisers were sworn by the sheriff, and the lands appraised in bulk.

It is further objected to the plaintiff's title that the lands were sold in gross. The evidence shows either a sale in parcels, or an offering in parcels without a bid, and a subsequent sale in gross. This course is sanctioned by decisions of this court. *Burmeister* v. *Dewey et al.*, 27 Iowa, 468.

2.——sale in gross: inadequacy of price.

It is further insisted that the price paid is grossly inadequate. The land was sold at sheriff's sale for $720. The plaintiff, since his purchase, has contracted it for $1,600. That the price is not so grossly inadequate as to avoid the sale, see *Cavender* v. *The Heirs of Smith*, *supra*, and cases cited. And that gross inadequacy of price is not

available when, as in this case, the original purchaser was a stranger to the transaction, and the premises have in good faith been sold to another, see *Shine* v. *Hill*, 23 Iowa, 267. In our opinion the objections to the plaintiff's title are not tenable.

II. Having determined that the plaintiff's title is not vitiated through any irregularities in the sheriff's sale, it remains to be considered whether it is paramount to the title of the defendant. It is insisted that the acknowledgment of the deed from Newman to Early is defective.

3. INTERNATIONAL LAW: commercial intercourse between belligerents.

It is further claimed that the deed from Newman to Early, executed between citizens of States at war, is void. It appears upon the face of the deed that it was made on the 8th day of December, 1863, by A. M. Newman, of Rockingham county, Virginia, to Jacob Early, of Allen county, Ohio. The court will take judicial notice of the fact that, at the date of the execution of this deed, the portion of Virginia in which the grantor resided was in open rebellion and actual hostility to the government of the United States. A civil war was then being waged, surpassing in magnitude any recorded in the history of nations, modern or ancient. The consequences of a state of war have been too uniformly recognized by civilized nations, and too clearly defined by publicists and jurists, to be matter of discussion at the present day. The masterly review of Chancellor KENT, in the case of *Griswold* v. *Waddington*, 16 Johns. 408, shows clearly that, as soon as a war is commenced, all trading, negotiation, communication or intercourse between the citizens of the countries at war, without the direct permission of the government, is unlawful. Hostilities exist not simply between the respective nationalities. Every citizen of the one instantly becomes the enemy of every citizen of the other. Any commerce between them is an act of *quasi* rebellion upon the part of the citizen against the State to which his allegiance is due, for

which he may be subjected to the most severe penalties. This rule, apparently harsh and severe, is really dictated by a wise and humane policy, and is the necessary and inseparable outgrowth of the belligerent condition. It is impossible that the amenities of peace should flourish during a state of hostilities, and any attempt to continue a kind of *quasi* friendly intercourse would only protract the war and increase the sufferings of the belligerents. Hence it is that the practice of all nations, the writings of all publicists, and the decisions of all courts concur in declaring that the opening of hostilities places an entire restraint upon all commerce and friendly intercourse between the citizens of belligerent States, except so far as the same may be licensed by their respective governments.

By the act of congress of July 13, 1861, section 5 (12 U. S. Stat. at large, 257), the president of the United States was authorized to declare, by proclamation, what States or parts of States were in insurrection against the United States; and it was provided that thereupon all commercial intercourse by and between the same, and the citizens thereof and the citizens of the rest of the United States, should cease, and be unlawful so long as such condition of hostility should continue. On the 16th day of August, 1861 (12 U. S. Stat. at large, 1262); 1st of July, 1862 (12 U. S. Stat. at large, 1266), the president issued his respective proclamations, declaring the inhabitants of Virginia, with certain designated exceptions, in a state of insurrection and rebellion against the United States, and that all commercial intercourse between the same and the inhabitants thereof, with the exceptions named, and the citizens of all other States and other parts of the United States, is unlawful, and will remain unlawful until such insurrection shall cease or be suppressed.

On the 2d day of April, 1863 (13 U. S. Stat. at large, p. 1, first appendix), the president issued his further proclamation, revoking the exceptions contained in the proclamation

of August 16, 1861, and declaring the entire State of. Virginia in insurrection against the United States, excepting forty-eight counties, designated as West Virginia. The county of Rockingham is not included in this exception. Hence, at the date of the execution of this deed, the portion of Virginia in which the grantor resided was, by proclamation of the president of the United States, declared to be in a state of insurrection and rebellion against the United States, and all commercial intercourse between the inhabitants thereof and the rest of the citizens of the United States was interdicted. And, as a consequence of this state of rebellion, the rules and doctrines of international law became applicable to and governed the conduct of the citizens of the hostile sections. *The Prize Cases*, 2 Black. 635; *The Venice*, 2 Wall. 258; *Mrs. Alexander's Cotton*, id. 419; *The Hampton*, 5 id. 372; *The William Bagley*, id. 377; *The Ouachita Cotton*, id. 251; *Hanger* v. *Abbott*, id. 532; *The Peterhoff*, id. 60; *Coppell* v. *Hall*, 7 id. 542; *McKee* v. *United States*, 8 id. 163; *The Grapeshot*, 9 id. 132.

Chancellor KENT, in his Commentaries, vol. 1, p. 76, 8th ed., says: "It follows as a necessary consequence of the doctrine of the illegality of all intercourse or traffic, without express permission, that all contracts made with the enemy during war are utterly void. The insurance of enemy's property is an illegal contract, because it is a species of trade and intercourse with the enemy. The drawing of a bill of exchange by an alien enemy, on a subject of the adverse country, is an illegal and void contract, because it is a communication and contract. The purchase of bills on the enemy's country, or the remission and deposit of funds there, is a dangerous and illegal act, because it may be cherishing the resources and relieving the wants of the enemy." And, we may add, that the purchase of enemy's real estate, situate within the territorial limits of the State with which he is at

Hill v. Baker.

war, by a citizen of the latter State, is unlawful, because it furnishes the enemy the sinews of war, and may embarrass the enforcement of any acts of confiscation to which it may be found expedient to resort.

Without further discussion of a question in which the understanding and practice of all civilized nations concur, we feel constrained to hold that the execution of the deed from Newman to Early was in violation of the principles of international law, and is, of consequence, void. We need not, therefore, consider whether the acknowledgment is properly executed.

III. As the deed from Newman to Early is void in consequence of its illegality, we are relieved from the necessity of an examination of the question whether Smith had notice thereof at the time of the sheriff's sale, or whether McCeeny or Hill had such notice at the time of their purchases. The deed from Early and wife bears date March 30, 1866. The sale was made to Smith and the sheriff's deed executed on the day following. The land had been attached prior to that time, so that the lien of the judgment under which the land was sold related to a time prior to that of the defendant's purchase. If, therefore, it should be conceded that he acquired title to the lands in controversy, by his purchase from Early, he took it subject to the lien of the attachment. It follows then, that whatever equities he may have must yield to the superior equities of the plaintiff *qui prior est tempore, potior est jure.*

*5. JUDICIAL SALE: judgment lien: attachment.*

The general term erred in reversing the judgment of the district court.

The plaintiff is entitled to the relief asked in his petition, and the defendant's cross-bill should be dismissed. The judgment of the general term is reversed, and the cause remanded for a decree in harmony with this opinion.

Reversed.